BETSY C. MANIFOLD (SBN 182450)
RACHELE R. BYRD (SBN 190634)
MARISA C. LIVESAY (SBN 223247)
BRITTANY N. DEJONG (SBN 258766)
**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIVA STEIN, <br><br> Plaintiff, <br><br> v. <br><br> RIGNET, INC., JAMES H. BROWNING, GAIL SMITH, STEVEN E. PICKETT, KEVIN J. O'HARA, MATTIA CAPRIOLI, DITLEF DE VIBE, KEVIN MULLOY, KEITH OLSEN, BRENT K. WHITTINGTON, VIASAT, INC., and ROYAL ACQUISITION SUB, INC., <br><br> Defendants. | Case No. **'21CV0289 JLS  BLM** <br><br> **COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Shiva Stein ("Plaintiff"), by her attorneys, makes the following allegations against RigNet, Inc. ("RigNet" or the "Company") and the members of the board of directors of RigNet (the "Board" or "Individual Defendants," along with RigNet, collectively referred to as the "Defendants"), for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed acquisition (the "Proposed Transaction") of RigNet by Viasat, Inc. ("Viasat"). The allegations in this complaint are based on the personal knowledge of Plaintiff as to herself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters stated herein.

## INTRODUCTION

1.  This is an action brought by Plaintiff to enjoin a transaction whereby Royal Acquisition Sub, Inc. will merge with and into RigNet with RigNet surviving the merger as the surviving corporation and wholly owned subsidiary of Viasat ("Proposed Transaction"). Pursuant to the Merger Agreement, RigNet shareholders will receive 0.1845 shares of Viasat common stock for each share of RigNet common stock owned (the "Merger Consideration"). The Board has unanimously recommended to the Company's stockholders that they vote for the Proposed Transaction at the special meeting of the RigNet shareholders.

2.  To convince RigNet stockholders to vote in favor of the Proposed Transaction, on February 1, 2021, the Board authorized the filing of a materially incomplete and misleading Registration Statement on Form S-4 (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). The Registration Statement violates Sections 14(a) and 20(a) of the Exchange Act by noncompliance with Regulation G and SEC Rule 14a-9 (17 C.F.R. § 244.100 and 17 C.F.R. § 240.14a-9, respectively).

3. Defendants have failed to disclose certain material information necessary for RigNet stockholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Registration Statement materially incomplete and misleading.

4. In particular, the Registration Statement contains materially incomplete and misleading information concerning the financial forecasts for the Company prepared and relied upon by the Board in recommending to the Company's stockholders that they vote in favor of the Proposed Transaction. The same forecasts were used by RigNet's financial advisor, Stifel, Nicolaus & Company, Inc. ("Stifel") in conducting its valuation analyses in support of its fairness opinion. The Registration Statement also contains materially incomplete and misleading information concerning certain financial analyses performed by Stifel.

5. The material information that has been omitted from the Registration Statement must be disclosed prior to the forthcoming stockholder vote in order to allow the stockholders to make an informed decision regarding the Proposed Transaction.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violations of Regulation G and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the stockholders vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, all material information discussed below is disclosed to RigNet stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated without corrective disclosures, to recover damages resulting from Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to Section 27 of the

Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

8. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that does sufficient business in California or an individual who has sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Viasat is headquartered in this District.

## PARTIES

10. Plaintiff has owned the common stock of RigNet since prior to the announcement of the Proposed Transaction herein complained of and continues to own this stock.

11. RigNet is a corporation duly organized and existing under the laws of Delaware and maintains its principal offices in Houston, Texas. RigNet is, and at all relevant times hereto was, listed and traded on the NASDAQ Stock Exchange under the symbol "RNET."

12. Viasat is a corporation duly organized and existing under the laws of Delaware and maintains its principal offices in Carlsbad, California. Viasat is, and at all relevant times hereto was, listed and traded on the NASDAQ Stock Exchange under the symbol "VSAT."

13. Defendant James H. Browning has been a member of the Board since 2010 and is the Chairman of the Board.

14. Defendant Gail Smith has been a member of the Board since 2018.

15. Defendant Steven E. Pickett has been a member of the Board since 2016 and is the Chief Executive Officer and President of the Company.

16. Defendant Kevin J. O'Hara has been a member of the Board since 2010.

17. Defendant Mattia Caprioli has been a member of the Board since 2013.

18. Defendant Ditlef de Vibe has been a member of the Board since 2011.

19. Defendant Kevin Mulloy has been a member of the Board since 2012.

20. Defendant Keith Olsen has been a member of the Board since 2010.

21. Defendant Brent K. Whittington has been a member of the Board since 2010.

22. The Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

23. The Defendants referred to in paragraphs 11-21 are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

*The Proposed Transaction*

24. On December 21, 2020, Viasat and RigNet jointly announced that they had entered into the Agreement and Plan of Merger (the "Merger Agreement"):

> CARLSBAD, Calif., Dec. 21, 2020 /PRNewswire/ -- Viasat Inc. (NASDAQ: VSAT), a global communications company, today announced it entered into a definitive agreement to acquire RigNet, Inc. (NASDAQ: RNET), a leading provider of ultra-secure, intelligent networking solutions and specialized applications, in an all-stock transaction that values RigNet at an enterprise value of approximately $222 million based on Viasat's share price as of the date of the agreement and RigNet's net debt at September 30, 2020.
>
> The acquisition will help to further accelerate Viasat's strategy to provide high-quality, ubiquitous, affordable broadband connectivity and communications to the hardest-to-reach locations around the globe. RigNet provides premier, global end-to-end, secure managed communications service and installation capabilities, along with digital transformation solutions, which will enable Viasat to quickly

- 4 -

expand into new adjacent industries, including: energy, shipping, maritime, mining and additional enterprises.

Rick Baldridge, Viasat's president and CEO commented, "With the acquisition of RigNet, we are accelerating the diversification of our connectivity portfolio and establishing a global foundation for expansion of our remote enterprise service offerings. RigNet's successful track record, global footprint, deep customer relationships and emerging technology expertise in areas like machine learning and artificial intelligence (AI) make this transaction an ideal fit as we launch our integrated global broadband platform. The transaction is accretive to cashflow, and is expected to improve our leverage position as well as offer multiple opportunities for expansion and performance upside beyond RigNet's robust energy services business. We're looking forward to welcoming the RigNet team to the Viasat family post-closing."

"There is a powerful alignment between RigNet and Viasat given our shared mission to provide fast, reliable coverage, anywhere customers require it," said Steven Pickett, president and CEO, RigNet. "We have broad experience integrating broadband connectivity and networking capabilities in the most challenging environments—gained from our global deployment of more than 1,200 onshore and offshore sites and 11,000 Industrial Internet of Things (IIoT) sites. This combination also represents an outstanding opportunity for us to accelerate both the investment in and the adoption of our digital transformation solutions more rapidly outside of our core oil & gas vertical. Our customers are demanding more enhanced communications solutions, and joining forces with Viasat—a recognized leader in satellite broadband connectivity—will enable us to serve them better."

**Industry expansion opportunities**

Acquiring RigNet will give Viasat direct access to over 650 customers and expand and diversify Viasat's commercial connectivity portfolio, providing Viasat an opportunity to more quickly enter adjacent industries. For example, by combining the strong gains in bandwidth efficiencies expected from the impending ViaSat-3 constellation and RigNet's portfolio of services, Viasat will become a leading vertically-

integrated energy communications provider with deep domain and customer expertise.

**Complementary digital transformation toolset**

Acquiring RigNet will give Viasat access to complementary core technology and services, including RigNet's digital transformation toolset, which includes its end-to-end managed communications and connectivity service capabilities, like SD-WAN; the Cyphre™ cybersecurity product-line; its large-scale applications and IIoT offering; and the Intelie Live™ real-time machine learning and AI analytics platform. Viasat expects to leverage and combine RigNet's digital transformation solutions, global enterprise experience, support infrastructure and back office systems to expand into new global services.

**Global alignment**

With over 650 employees, RigNet has a strong global support infrastructure and operations foundation with more than 50% of its employees overseas. RigNet's international presence aligns with Viasat's expanding global operations, enabling Viasat to find additional value and business complements for its ViaSat-3 globalization efforts.

Viasat intends to incorporate RigNet into its Global Enterprise and Mobility business unit, led by President Jimmy Dodd, which will provide further complementary capabilities and support synergies to Viasat's existing mobility businesses. The RigNet team operates from its headquarters in Houston, Texas; management is expected to stay on to provide leadership, in-depth industry knowledge and customer relationship support.

**Transaction details**

Under the terms of the agreement, RigNet stockholders will receive 0.1845 shares of Viasat common stock for each share of RigNet common stock, which represents a 17.9% premium based on the 20-day volume-weighted average prices of Viasat and RigNet. The transaction represents an enterprise value for RigNet of approximately

$222 million, consisting of approximately $130 million in RigNet equity value, based on the closing price of Viasat common stock as of the date of the agreement and the assumption of approximately $92 million in RigNet debt, net of cash, at September 30, 2020. The transaction is expected to close by mid-calendar year 2021, subject to the satisfaction of regulatory approvals and other customary closing conditions.

Viasat has also entered into a support agreement with certain stockholders of RigNet, under which such stockholders have agreed to vote all of their RigNet shares in favor of the transaction at the special meeting of RigNet stockholders to be held in connection with the transaction, subject to certain terms and conditions. The RigNet shares subject to the agreement represent approximately 25% of the current outstanding voting power of the RigNet common stock.

**Advisors**

LionTree Advisors LLC and Latham & Watkins LLP acted as Viasat's financial and legal advisors, respectively. RigNet's financial and legal advisors in the transaction are Lazard Middle Market LLC and Baker Botts LLP, respectively.

* * *

***The Materially Misleading and Incomplete Solicitation Statement***

25. On February 1, 2021, Defendants caused the Registration Statement to be filed with the SEC in connection with the Proposed Transaction. The Registration Statement solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote

in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

***Financial Forecasts***

26. The Registration Statement discloses tables for forecasts for RigNet (the "Company Projections"). However, the Registration Statement fails to provide material information concerning these Company Projections, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Transaction. These financial forecasts were also relied upon by Stifel in rendering its fairness opinion.

27. First, the Registration Statement completely fails to disclose any prospective financial information for Viasat. This information is material as RigNet shareholders will own 6% of the combined company when the Proposed Transaction is consummated, and Stifel reviewed and relied on the Viasat projections to render its fairness opinion and performing the financial analyses. *See* Registration Statement at 64.

28. With respect to the Company Projections, the Registration Statement fails to provide: (i) the value of certain line items used to calculate (a) Adjusted EBITDA, and (b) Unlevered Free Cash Flow, both of which are non-GAAP measures; and (ii) a reconciliation to its most comparable GAAP measures, in direct violation of Regulation G and, consequently, Section 14(a).

29. The SEC has indicated that if the most directly comparable GAAP measure is not accessible on a forward-looking basis, the company must disclose that fact, provide any reconciling information that is available without unreasonable effort, identify any unavailable information and disclose the probable significance of that information. A company is permitted to provide the projected non-GAAP measure, omit the quantitative reconciliation and qualitatively explain the types of gains, losses, revenues or expenses that would need to be added to or subtracted from the non-GAAP measure to arrive at the most directly comparable GAAP

measure, without attempting to quantify all those items.

30. When a company discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all forecasts and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

31. Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific, non-GAAP financial measures implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that

>audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

32. The SEC has repeatedly emphasized that disclosure of non-GAAP forecasts can be inherently misleading and has therefore heightened its scrutiny of the use of such forecasts.[2] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DI") on the use of non-GAAP financial measures to clarify the extremely narrow and limited circumstances, known as the business combination exemption, where Regulation G would not apply.[3]

33. More importantly, the C&DI clarifies when the business combination exemption does not apply:

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for non-GAAP financial measures disclosed in communications subject to Securities Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (last visited Feb. 17, 2021) (emphasis added).

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited Feb. 17, 2021); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, THE NEW YORK TIMES (Apr. 22, 2016), http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited Feb. 17, 2021).

[3] *Non-GAAP Financial Measures*, U.S. SECURITIES AND EXCHANGE COMMISSION (Apr. 4, 2018), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101 (last visited Feb. 17, 2021). To be sure, there are other situations where Regulation G would not apply but are not applicable here.

exemption does not extend beyond such communications. Consequently, if the same non-GAAP financial measure that was included in a communication filed under one of those rules is also disclosed in a Securities Act registration statement, proxy statement, or tender offer statement, this exemption from Regulation G and Item 10(e) of Regulation S-K would not be available for that non-GAAP financial measure.

*Id.*

34. Thus, the C&DI makes clear that the so-called "business combination" exemption from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the extent that a third-party, such as a financial advisor, has utilized projected non-GAAP financial measures to render a report or opinion to the Board. To the extent the Board also examined and relied on internal financial forecasts to recommend a transaction, Regulation G applies.

35. Thus, to bring the Registration Statement into compliance with Regulation G as well as cure the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

***Financial Analyses***

36. With respect to Stifel's *Public Trading Comparables Analysis for RigNet*, the Registration Statement fails to disclose the individual multiples and metrics for each company observed by Stifel in the analysis.

37. With respect to Stifel's *Selected Precedent Transactions Analysis for RigNet*, the Registration Statement fails to disclose the individual multiples and metrics for each transaction observed by Stifel in the analysis, including closing date, the amounts paid for each target company, and the multiples of EV to LTM revenue and LTM EBITDA for each transaction.

38. With respect to Stifel's *Discounted Cash Flow Analysis for RigNet*, the Registration Statement fails to disclose: (i) the basis for applying the range of

exit multiples from 5.0x to 7.0x; (ii) the basis for applying a range of perpetuity growth percentages from 0.00% to 2.00%; and (iii) the basis, inputs, and assumptions for applying discount rates ranging from 12.0% to 14.0%.

39. With respect to Stifel's *Selected Comparable Company Analysis for Viasat*, the Registration Statement fails to disclose the individual multiples and metrics for each company observed by Stifel in the analysis.

40. With respect to Stifel's *Discounted Cash Flow Analysis for Viasat*, the Registration Statement fails to disclose: (i) the basis for applying the range of exit multiples from 5.0x to 7.0x and 8.5x to 10.5x for Viasat's Satellite Services/Commercial segment and Government segment, respectively; (ii) the basis for applying a range of perpetuity growth percentages from 1.00% to 3.00%; and (iii) the basis, inputs, and assumptions for applying discount rates ranging from 7.0% to 9.0%.

41. With respect to Stifel's *Pro Forma Combined Company Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) the present value of unlevered free cash flows for the pro forma combined company for projected calendar years 2021 through 2024; (ii) the basis, inputs, and assumptions for applying discount rates ranging from 7.0% to 9.0%; (iii) the range of illustrative terminal values at the end of 2024; (iv) the basis for applying multiples ranging from 6.5x to 8.5x; (v) the basis for applying a range of perpetuity growth percentages from 1.0% to 3.0%; (vi) the pro forma combined net debt, net debt for Viasat, and net debt for RigNet; and (vii) the pro forma fully diluted share count of the combined company.

42. In sum, the Registration Statement independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial measure to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Registration Statement

independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Registration Statement to garner votes in support of the Proposed Transaction from RigNet shareholders.

43. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff will not be able to make a fully informed decision regarding whether to vote in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**FIRST CAUSE OF ACTION**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

44. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

45. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Registration Statement or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

46. As set forth above, the Registration Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly

comparable" GAAP measure. 17 C.F.R. § 244.100(a).

47. The failure to reconcile the numerous non-GAAP financial measures included in the Registration Statement violates Regulation G and constitutes a violation of Section 14(a).

## SECOND CAUSE OF ACTION

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

48. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

49. SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a-9.

50. Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading." 17 C.F.R. § 244.100(b).

51. Defendants have issued the Registration Statement with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, amongst other things, the financial forecasts for the Company.

52. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the

Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

53. The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

54. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading.

55. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial forecasts.

56. RigNet is also deemed negligent as a result of the Individual

Defendants' negligence in preparing and reviewing the Registration Statement.

57. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

58. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## THIRD CAUSE OF ACTION
### (Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act)

59. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60. The Individual Defendants acted as controlling persons of RigNet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of RigNet, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62. In particular, each of the Individual Defendants had direct and

supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Registration Statement.

63.   In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

66.   Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Preliminarily and permanently enjoining Defendants and their

counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B. In the event that the proposed transaction is consummated, rescinding it and setting it aside, or awarding rescissory damages;

C. Awarding compensatory damages against Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law, arising from the Proposed Transaction;

D. Awarding Plaintiff the costs and disbursements of this action and reasonable allowances for fees and expenses of Plaintiff's counsel and experts; and

E. Granting Plaintiff such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: February 17, 2021

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:   *s/ Rachele R. Byrd*
      RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
MARISA C. LIVESAY
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Of Counsel:**

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLLP**
Gloria Kui Melwani
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
melwani@whafh.com

***Counsel for Plaintiff***